## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ESZTER PRYOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-00163 |
| | ) | |
| | ) | |
| THE OHIO STATE UNIVERSITY | ) | JUDGE SARAH D. MORRISON |
| | ) | MAGISTRATE KIMBERLY A. JOLSON |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Eszter Pryor, in response to Ohio State University's Motion for Summary Judgment (DN 16), states the following:

### COUNTERSTATEMENT OF FACTS

As discussed in the sections below, discovery is ongoing (and has only just begun). The following facts reflect only what Plaintiff has been able to determine from discovery thus far. Plaintiff expects that more factual information will come to light as discovery progresses. Here is what we know so far:

**Nearly one year before August 10, 2014, OSU was aware that Bohonyi was having inappropriate interactions with the minors he coached.** In her October 2013 performance review, Christine Thompson, who was then OSU's Director of Aquatic Events, said that Bohonyi was "learning what is and is not appropriate in conversations outside of the staff." (Annual Performance review, attached hereto as Exhibit 1,

p.OSU000017.) Thompson questioned Bohonyi's "maturity of judgment and professionalism appropriate for the environment" in the same review (*Id.* at p.OSU000019). Both head diving coach John Appleman and varsity diving coach Justin Sochar had talked to Bohonyi about "boundaries" prior to August of 2014. (Skinner interview, attached hereto as Exhibit 2, p.OSU000154.) In OSU's case report on the investigation in to Bohonyi's conduct, OSU notes that Bohonyi "acknowledged that he has been previously coached that he needs to be cognizant of his interactions with the divers he coaches and to not be too 'friendly'." (OSU case report, attached as Exhibit 3, p.OSU000049.) Also in that case report, OSU's Associate Director of Aquatics stated that he was aware that Bohonyi had been counseled on boundaries with his divers prior to August 10, 2014. Skinner interview with Kristi Hoge. (*Id.* at 154.) All of the divers Bohonyi coached at Ohio State were children. (Skinner depo. excerpts, pp.7:21-25; 8:1-3, attached hereto as Exhibit 4.)

Despite having information that Bohonyi texted "frequently" and "inappropriately" with "divers" (plural), as part of their investigation, Ohio State did not ask any of Estee's teammates if they had also received inappropriate text messages from Bohonyi (Kristi Hoge depo. excerpts, pp.26:4-25; 27:1-7, attached as Exhibit 5.) Skinner also reported in his Ohio State interview that "athletes" had inappropriate frequency of texting from Will Bohonyi. (Exhibit 2, p. 154.) On August 11, 2014, "it was reported by a **number of sources** to the Aquatics Administration on August 10, 2014, that a seventeen-year-old member of the The Ohio State Diving Club, a USA Diving

year-round competitive team has been in a consensual/sexual relationship with Mr. William Bohonyi." (Exhibit 3, p.OSU000046, emphasis added.) Ignoring for the moment Ohio State's improper characterization of the criminal sexual relationship between an adult coach and a child athlete as "consensual," Ohio State launched an investigation into the allegations.

As part of their "investigation," neither Ohio State University, nor their police department, even attempted to obtain Mr. Bohonyi's phone records (Exhibit 5, p.27:8-12), despite Bohonyi admitting to their investigator that he had deleted texts that could be "perceived as inappropriate," including pictures. (Bohonyi Interview Notes, p.OSU000195, attached hereto as Exhibit 6.)Ohio State did not even bother to interview their current varsity diving coach Justin Sochar, despite having information that Pryor had talked to him about her sexual encounters with Bohonyi. (Exhibit 5, p.31:5-9.) In 2014 Ohio State did not have any specific policies pertaining to the relationships between adult employees and minor children. (Exhibit 5, p.54:20-25.) Predictably Ohio State's investigation was, "unable to conclude that the greater weight of the evidence supports a finding that the complainant and Mr. Bohonyi engaged in consensual oral sex on July 7, 2014 and/or sex on July 17, 2014." Four years later, after the intervention of the Franklin County Prosecutor's office, Will Bohonyi pleaded guilty to the criminal sexual battery of Estee Pryor.

**After August 10, 2014, Bohonyi continued to sexually abuse the Plaintiff.** It is important to note that Bohonyi's sexual abuse of Plaintiff did not stop just because he

was terminated from his job. As detailed in the complaint and in Plaintiff's attached declaration, Bohonyi continued to abuse Pryor for an entire year after the allegations were reported to OSU. According to Plaintiff, some of these encounters occurred on OSU's campus. (DN #1, Complaint, ¶¶ 62-71, PageID #: 12-14; Declaration of Estee Pryor, attached hereto as Exhibit 7.) OSU apparently does not dispute that Bohonyi continued to abuse Pryor, but disputes that the abuse occurred on campus. (DN #16, p.6, PageID #: 176.)

**After August 10, 2014, Bohonyi enjoyed continued access to campus, along with other benefits of a relationship with OSU.** A key dispute of material fact in this case concerns how much access to Ohio State facilities following his termination. OSU seeks to evade this uncomfortable issue by simply asserting that Bohonyi was "banned" from campus after his termination. (DN 16, p.6, Page ID: #176.) The facts as developed thus far tell quite a different story. First and foremost, the Plaintiff herself disputes this; as discussed above and in her attached declaration, Bohonyi continued to abuse her – on OSU's campus – for months after his termination. (Exhibit 7.)

In addition, it is undisputed that prior to August 10, 2014, Will Bohonyi had independent access to the Ohio State pool, via his "BuckID" card. Other than self-serving testimony, Ohio State cannot prove that the Mr. Bohonyi's BuckID was taken away, as confirmed by Zach Skinner during his deposition:

Q: "Do you have any proof other than your word?

A: Yeah I don't have any proof of that. It (Will's BuckID card) sat in my desk drawer for years actually and I moved offices when I changed roles and I **shredded it on my way out in 2019**. But, no, I don't have any proof that I took that"

(Exhibit 4, pp.10:23-25; p.11:1-4, emphasis added.)

The allegations in this case were originally filed in Federal Court in the Southern District of Indiana in July 2018 and The Ohio State Diving Club was included as a defendant in that original filing. *See Pryor v. USA Diving, Ohio State University Diving Club, and Will Bohonyi,* 1:18-cv-02113 WTL-MJD (S.D. Ind. 2018). By 2019, when Skinner "shredded" Bohonyi's ID, Ohio State was well aware of the allegations in this case, including that Estee and Will continued to have sex after August 2014 and that some of the alleged sexual acts occurred at Ohio State University. (*Id*. at DN 1 p.29.) Bohonyi's BuckID card should been have preserved as it is a key piece of evidence demonstrating what access Bohonyi had to OSU's campus after August 2014.

Perhaps the biggest benefit Bohonyi enjoyed was the fact that OSU knew that he had received hundreds of explicit pictures of Estee Pryor as early as August 2014, and OSU police had possession of the phone containing those photos since 2016, but OSU did nothing with that information for *years*. (OSU Dept. Of Public Safety Report, p.OSU000191, attached as Exhibit 8.) In August of 2014, the OSU police should have asked for a warrant to search Bohonyi's phone and to obtain his records from Snapchat and other applications, instead OSU and their "independent" police department did nothing. In 2016 Estee delivered her phone to the OSU police department, who again did nothing. (*Id*.)  Although Bohonyi was eventually charged with sexual battery and

5

pandering sexually explicit material, that was not until November of 2018 – more than four years after OSU learned of the photos and two years after the OSU police received the photos.[1] Worse, it was Pryor herself, then an adult, who requested that OSU reopen the investigation in 2018 (Exhibit 7.)

**OSU's culture of abuse and failure to investigate complaints of sexual misconduct is well documented.** As set forth in Plaintiff's Complaint, on June 23, 2010, the United States Department of Education's Office for Civil Rights ("OCR") initiated a review of OSU's compliance with Title IX. On September 11, 2014, after a four-year-long review of OSU, OCR announced that the university had violated Title IX.[2] Specifically, OCR found that OSU's policies and procedures were confusing and inconsistent, failed to designate timeframes for the completion of major stages of sexual abuse investigations, and failed to ensure that complainants were afforded equal opportunity to participate in the grievance process, in violation of Title IX. In some cases, OCR was unable even to reach a determination about whether OSU adequately responded to complaints because OSU's complaint files were sloppy and indecipherable.[3] On August 8, 2018, OCR initiated yet another investigation into OSU's compliance with Title IX—this time involving OSU's response to students' allegations of sexual misconduct by Dr.

---

[1] Bennett Haeberle, *Former OSU dive club coach turns himself in after indictment for sexual battery, pandering*, WBNS News, November 30, 2018 (available at https://www.10tv.com/article/news/local/former-osu-dive-club-coach-turns-himself-after-indictment-sexual-battery-pandering/530-f91b0e4b-132f-44a6-833f-29992f728496)

[2] OCR Findings Letter, available at https://www2.ed.gov/documents/press-releases/ohio-state-letter.pdf

[3] Id. at 27-29; see also Resolution Agreement, Ohio State University, OCR Docket #15-10-6002, https://www2.ed.gov/documents/press-releases/ohio-state-agreement.pdf.

Richard Strauss.[4] Strauss's conduct, and OSU's response thereto, was the subject of another Title IX lawsuit in this Court. *Garrett v. Ohio State U.*, 561 F. Supp. 3d 747, 751 (S.D. Ohio 2021). The allegations in that lawsuit involved "hundreds, perhaps thousands" of victims who were ignored by OSU for two decades.

Like Strauss and other abusers, many coaches at OSU had enormous power, which they exercised with total impunity. For example, when asked in 2011 whether he would dismiss then-football coach Jim Tressel (for conduct unrelated to the abuse discussed in this case), the OSU president replied: "No, are you kidding? Let me just be very clear: I'm just hopeful the coach doesn't dismiss me."[5]

In the *Garrett* case, this Court has criticized OSU's handling (or rather non-handling) of sexual harassment complaints during the same period of time that Pryor was abused by Bohonyi. Although this Court dismissed claims brought on behalf of *adult* abuse victims under the applicable statute of limitations, Judge Watson specified in his ruling: "From 1979 to 2018, Ohio State utterly failed these victims. . .. Plaintiffs beseech this Court to hold Ohio State accountable, but today, the legal system also fails Plaintiffs."[6] *Garrett v. Ohio State U.*, 561 F. Supp. 3d 747, 751 (S.D. Ohio 2021).

---

[4] Sarah Buduson, *Betrayed: How Ohio failed hundreds of male athletes abused by OSU's Dr. Richard Strauss*, News 5 Cleveland (June 24, 2021), https://www.news5cleveland.com/news/local-news/investigations/betrayed-how-ohio-failed-hundreds-of-male-athletes-abused-by-osus-dr-richard-strauss

[5] *Gee: No Tressel dismissal*, The Columbus Dispatch (Mar. 8, 2011), available at https://www.youtube.com/watch?v=dCutRJvTK6c.

[6] Marty Schladen, *OSU denies it was fighting sex-abuse victims' ability to sue*, Ohio Capital Journal (April 15, 2022) (available at https://ohiocapitaljournal.com/2022/04/15/osu-denies-it-was-fighting-sex-abuse-victims-ability-to-sue/).

**Plaintiff was retaliated against for reporting sexual harassment**. A final key dispute of fact concerns the actions taken by OSU immediately after it received a report that Bohonyi was abusing Pryor. Plaintiff contends that she was asked to leave the Senior Nationals competition when Thompson and Appleman received the complaint of harassment. (Exhibit 7) Appleman denies this allegation. (Exhibit 9 Appleman depo., 16:7.)

## STANDARD OF REVIEW

Plaintiff does not disagree with the sum and substance of the standard of review set forth in OSU's motion, but notes that the provisions of Fed. R. Civ. P. 56(d) also apply here, to wit:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

For the reasons set forth below, the Court should deny OSU's motion both because Plaintiff cannot yet present facts essential to justify her opposition to it, and because a genuine issue of material fact as to OSU's liability may be demonstrated even at this early stage in the litigation.

## ARGUMENT

## I.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DEFERRED OR DENIED AS PREMATURE

Plaintiff filed her complaint on January 18, 2022. DN#1. The parties' Rule 26(f) report was filed on March 2, 2022 and indicated that discovery would be completed by October 1, 2022. (DN 10.) On April 5, 2022, before the first set of written discovery requests was served or the first deposition scheduled, OSU moved for summary judgment. (DN 16.) The parties agreed on a briefing schedule which would have allowed more time to conduct discovery, and to index and analyze the discovery conducted, but the magistrate deemed the agreed-upon schedule to be "too lengthy." (DN 24.) Plaintiff's counsel had a multi-week jury trial in Raleigh, North Carolina in April and May *(Daughter Doe 1 v. United States Swimming et. Al,* Wake County Superior Court Div. 1, 18-cvs-10774) and had to fit what should have been two months of discovery into one. Further Ohio State did not produce any documents until Friday May 20, 2022, and produced supplemental documents and privilege logs as late as June 22, 2022.

The week before the due date of this motion, the parties hastily completed five depositions so as to meet the deadline for this response, and the plaintiff is just at the tip of the proverbial iceberg of OSU's misconduct, as discussed in further detail below. In sum, the parties have not had time to complete discovery, there are outstanding discovery disputes[7], and Plaintiff has barely had time to review and compile the information gathered thus far.

---

[7] This is evidenced by OSU's motion for protective order, filed more than two weeks after their Motion for Summary Judgment. DN 19. In addition, Ohio State has withheld identifying information about the identity of at least one other minor who had knowledge of Bohonyi's illegal sexual contact with Ms. Pryor

As such, the Defendant's Motion is premature, and should be held in abeyance, stricken, or denied outright until the parties have an opportunity to complete discovery. See, e.g., *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (U.S. 1986) ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, *as long as the plaintiff has had a full opportunity to conduct discovery.*") (emphasis added). The Supreme Court, in interpreting Federal Rule of Civil Procedure 56, stated that courts "must draw all reasonable inferences in favor of the non-moving party." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). In *Reeves*, the Supreme Court discussed the Court's obligations under Rule 56 and fully explained the distinction between the role of the court and the role of the jury. *Id.* at 150.

> [T]he court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence. 'Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge.' *Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the non-moving party as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'*

*Id.* at 150-151(citations omitted) (emphasis added). If an allegation is capable of more than one inference, this Court must construe it in the plaintiff's favor. *Columbia Natural*

---

when she was a minor. The parties have met and conferred, and Plaintiff will be submitting a motion to compel on that issue should her claims survive summary judgment.

*Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citing *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)).

This standard requires a clear showing by the moving party in order to prevail on a motion for summary judgment. OSU cannot make such a showing – especially not on the fact-intensive arguments they present – because discovery has not yet been completed.

Specifically, and as detailed in the declaration of counsel attached hereto as Exhibit 10, Plaintiff expects that additional discovery will demonstrate the following information which is critical to her claims in this case:

- What OSU officials knew about Bohonyi's proclivities and when;

- Whether OSU officials took appropriate – or any – corrective action against Bohonyi based on what they knew prior to August 10, 2014;

- What amenities – and access to minors, including Plaintiff – Bohonyi continued to enjoy because of OSU after August 10, 2014.

- The reasons, if there are any, for why OSU sat on evidence of child pornography relevant to this case for four years;

- The extent to which OSU officials knowingly retaliated against Plaintiff following the complaint of sexual harassment.

The relevance of these items is explained both in counsel's declaration and in the sections below.

## II.     THE LIMITED DISCOVERY CONDUCTED THUS FAR DEMONSTRATES GENUINE ISSUES OF MATERIAL FACT ON PLAINTIFF'S TITLE IX CLAIMS

Title IX covers a broad range of conduct, and the Supreme Court has specifically instructed courts to "accord . . . a sweep as broad as its language." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982). In the summary judgment context, courts must resolve three related inquiries: First, the plaintiff must be able to identify an "appropriate person" under Title IX, i.e., a school district official with the authority to take corrective measures in response to actual notice of sexual harassment. Second, the substance of that actual notice must be sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment. And finally, the official with such notice must exhibit deliberate indifference to the harassment. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1999); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). These elements are considered separately below. Retaliation claims under Title IX are analyzed under a separate framework, also presented below.

### A.  **Appropriate person**

OSU does not appear to question whether a complaint of harassment was made to an "appropriate person" under the *Gebser/Davis* standard, *supra*. Still, it is worth noting that OSU myopically focuses on the single report of harassment to John Appleman, and then to Christine Thompson, on August 10, 2014. (DN 16, p.9, PageID: #179.) As discussed above, there were obviously other reports before that. Otherwise, OSU officials would not have known that Bohonyi was getting "too friendly" with his minor mentees. (Exhibit 1.) Plaintiff does not yet know the sources nor the details of

these prior complaints, and it is perhaps understandable that OSU would want to keep her from knowing such things. However, as discussed in the next section, prior information about Bohonyi's behavior – with any diver, at any time – is critical to an assessment of actual notice.

### B.  Actual notice

OSU asserts that "it is undisputed that Ohio State did not receive notice of reports of an inappropriate relationship between Mr. Bohonyi and Ms. Pryor until August 10, 2014[.]" (DN 16, p.9, PageID #:179.) Thus, according to its argument, it did not have "actual notice" of sexual harassment under the *Gebser/Davis* standard until that day, and it acted swiftly to discipline Bohonyi thereafter.

OSU misunderstands "actual notice" in the Title IX context. Actual notice is not limited to what OSU knew about what transpired between Bohonyi and Pryor specifically; it includes what the employer knew about the proclivities of its harasser-employee before the harassment occurred. In *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 363 (6th Cir.2005), the Sixth Circuit made it clear that "actual notice" did not require knowledge of a specific risk *to the plaintiff*, but rather that a "substantial risk" *to children* posed by a teacher was sufficient. This is the approach favored by nearly all courts to have meaningfully addressed the question of notice. In *Doe v. Sch. Bd. of Broward County, Fla.*, 604 F.3d 1248 (11th Cir. 2010), the Eleventh Circuit held that prior *unsubstantiated* complaints against a teacher were enough to demonstrate "actual notice," and for good reason – to hold otherwise would be to disincentivize

substantiation of claims simply to avoid liability. More recently, in *Doe v. Fairfax County Sch. Bd.*, 1 F.4th 257 (4th Cir. 2021), the Fourth Circuit held that a report of harassment constitutes "notice" within the meaning of Title IX regardless of whether the school does anything with that complaint.

Here, just from what has come to light during a short round of discovery, we already know that Bohonyi was counseled multiple times on his inappropriate interactions with the minor divers he coached at OSU. That is enough to trigger an inference that Bohonyi posed a "substantial risk" to the Plaintiff and others in her situation, and that OSU knew about that risk – at least enough of an inference to permit further discovery.

In any event, even if the Court accepts OSU's interpretation of the notice requirement, there is a disputed issue of fact as to whether (and when) OSU knew about the misconduct between Bohonyi and Pryor. Their illicit relationship persisted for months under OSU's watch. One cannot simply take OSU at their word that they did not know about it for that entire time; Plaintiff believes, and is entitled to prove, that they knew and just did not care. Indeed, that is precisely what OSU's laissez-faire track record suggests.

### C. Deliberate indifference

A university is liable under a deliberate indifference standard where it has "control over both the harasser and the context in which the known harassment occurs," has actual knowledge of the harassment or abuse, and fails to act to end it.

14

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999). Merely acknowledging a complaint of sexual harassment and continuing with attempted remedies that are not effective is not enough to avoid the deliberate indifference standard:

> [W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

*Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260-61 (6th Cir. 2000).

Here, there is evidence both that OSU was deliberately indifferent to a known substantial risk posed by Bohonyi to minor divers (as discussed above), and that the remedial action taken after OSU learned of the assault was ineffective. Plaintiff believes that Bohonyi continued to enjoy access to OSU's facilities and amenities, with OSU's knowledge and tacit consent, and that this access allowed him to continue to sexually abuse the Plaintiff. Instead of informing the children and their parents in the Ohio State diving club about the reason for Bohonyi dismissal, and instead of giving the child pornography in their possession to the Franklin County Prosecutor, Ohio State protected Bohonyi and his reputation. Plaintiff is entitled to prove all of this.

In its motion, OSU simply states that it "is unaware of Mr. Bohonyi violating its ban prohibiting him from Student Life and aquatic facilities after August 10, 2014." This is what any agent of OSU would say under these circumstances. The question that Plaintiff is entitled to answer in discovery is: is it true? Did OSU allow him back on campus? If he came back on campus, even multiple times, in the capacity of a coach or a

sales representative, were they really "unaware" of it? If he continued to abuse Pryor on campus, as Pryor has testified to, is it enough for OSU to simply say "we didn't know about that," and escape liability? Surely not – at least not without the full benefit of discovery on this point.

Even if the Court accepts OSU's self-serving "we didn't know" argument, there is still ample evidence of deliberate indifference by OSU – indifference the directly led to even more abuse by its former employee. As discussed above, OSU was in possession of explicit photos of Estee Pryor in 2016, and OSU could have made an effort to obtain those very photos as early as August 2014, but elected to do nothing.  OSU officials likely had an affirmative obligation under Ohio law to alert the proper authorities to those photos. See Ohio Rev. Code § 2151.421. Instead, they did nothing with them for two years, and even then they only delivered them to a prosecutor at Plaintiff's urging. Had Bohonyi been charged with the crimes he was obviously guilty of when OSU first learned of the explicit photos of Pryor as a minor, Bohonyi would not have had continued access to Pryor – there is virtually no question that her abuse would have stopped.

As a final note on this point, the Court should not look at these allegations in a vacuum. OSU spends much of its Motion assuring and reassuring the Court that it had adequate measures in place to address complaints of sexual misconduct. But it is well documented that OSU's attitudes and procedures about sexual harassment under Title IX were deficient, at least through 2018. It is not necessary to take Plaintiff's word for it;

16

both the Office of Civil Rights and *this Court* have said as much. *Garrett v. Ohio State U.*, 561 F. Supp. 3d 747, 751 (S.D. Ohio 2021) (discussed *supra*). OSU's questionable track record alone should be sufficient to allow discovery on the issue of their deliberate indifference, especially when coupled with the already damning evidence of their nonfeasance in this case.

### D. Retaliation

To prevail on a Title IX retaliation claim, the plaintiff must show that: (1) the plaintiff engaged in conduct protected under Title IX; (2) the funding recipient knew of the protected activity; (3) the plaintiff was subjected to an adverse action at the time, or after, the protected conduct took place; and (4) the defendant's decision to take the adverse action would not have happened but for the report of sexual harassment. *Doe v. Rutherford County*, 86 F. Supp.3d 831, 842 (M.D. Tenn. 2015).

Here, there is little question that if OSU officials sent Pryor home from Senior Nationals and instructed her not to compete right after receiving a complaint that she was being abused by an OSU coach, the above factors are satisfied. There is a bedrock dispute of material fact on this point: Pryor says it happened, Appleman and Thompson say it did not. Summary judgment should be denied on this basis alone.

Again demonstrating a callous disregard for the safety of the minor children in their diving program, OSU did not inform minor divers or their parents as to why Bohonyi was not returning to the Ohio State Diving Club. (Email of 8/29/14, attached hereto as Exhibit 11; Christine Thompson depo. excerpts, p.60:22-25, attached as Exhibit

12.) Christine Thompson admitted that her letter announcing the "dismissal" of Mr. Bohonyi does not state he was fired, or more importantly it makes no mention that Mr. Bohonyi engaged in criminal sexual contact with a minor (*Id*. at 61:2-20.) Ohio State's omission of any information about the reasons for Mr. Bohonyi's dismissal allowed Mr. Bohonyi to continue coaching with organizations, including the AAU, and to privately coach divers at other locations including the Westerville, Ohio Community Pool. (Exhibit 7.)

### III. THE APPROPRIATE STATUTE OF LIMITATIONS IS GOVERNED BY OHIO REV. CODE § 2305.111(C)

OSU closes by arguing that the applicable statute of limitations should be two years, not twelve as set forth in Ohio Rev. Code § 2305.111(C). In support, OSU cites a single unpublished case from the Northern District of Ohio, and then (candidly) cites a more recent *published* case from the same court reaching what appears to be the opposite conclusion. (DN 16, p.15, citing *Spragling v. Akron Pub. Sch.*, No. 5:18CV1969, 2019 WL 1255215, at *1 (N.D. Ohio Mar. 19, 2019) and *Doe 1 v. Cleveland Metro. Sch. Dist. Bd. of Educ.*, 533 F.Supp.3d 567 (N.D. Ohio 2021).

*Doe 1* is not only published law but reflects the correct and just result.[8] In that case, Judge Calabrese considered – and rejected – all of the arguments advanced by OSU in

---

[8] This Court has previously cited to *Doe 1* without any apparent disfavor. See *Garrett v. Ohio State U.*, 561 F. Supp. 3d 747, 761 (S.D. Ohio 2021). This Court has not yet cited to *Spragling* for any reason, nor has any other federal court in the three years since it was decided.

this case, including the court's earlier opinion in *Spragling*. The court's relevant

reasoning on that point is reproduced below:

> [T]he court in *Spragling* [ ] held that Sixth Circuit authority bound it to apply Ohio's two-year statute of limitations under Title IX. . . . The Sixth Circuit authority on which *Spragling* and *Fudge* relied came in *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 729 (6th Cir. 1996). There, the Sixth Circuit held that Tennessee's one-year statute of limitations applied under Title IX, not the 180-day statute of limitations under the Title VI regulations. In reasoning that the shorter period for initiation of administrative proceedings did not apply, the court concluded that "the most analogous state limitations period was, as in section 1983 and section 1985 claims, the period applicable to personal injury claims." *Id.* (quoting *Bougher v. University of Pittsburgh*, 882 F.2d 74, 77 (3d Cir. 1989)).
>
> Therefore, *Lillard* did not hold that the personal-injury limitations period applies instead of a more analogous statute of limitations. As between the deadline to commence administrative proceedings and Tennessee's more analogous personal injury statute, the latter applied. That holding is far different than a conclusion that the personal-injury limitations period *always* applies, even if a more analogous State statute is available.
>
> *Spragling* also relied on a ruling from the Supreme Court holding that "a State's personal injury statute of limitations should be applied to all § 1983 claims." *Owens v. Okure*, 488 U.S. 235, 240–41, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). There, the Supreme Court explained that federal courts should borrow the most analogous statute of limitation available under State law in Section 1983 case. . . . In *Spragling* and *Fudge*, the court seized on the last sentence of this discussion to conclude that federal law directs the use of a State's statute of limitations for a personal injury action. But that reading ignores the context of the discussion, which referenced *Wilson v. Garcia*, 471 U.S. 261, 278–80, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), where the Supreme Court resolved disagreement over the proper statute of limitations for actions under Section 1983 in the face of congressional silence on the question. . . . In that case, as in *Owens*, the Supreme Court merely applied the general principle that the most analogous State statute of limitation applies. . . . Here, Section 2305.111(C) of the Ohio Revised Code provides the most analogous limitations period. . . .
>
> Recognizing that Section 2305.111(C) applies to any claim for childhood sexual abuse filed on or after August 3, 2006, the effective date of the legislative amendment to the statute, the Ohio Supreme Court determined that the statute

means what it says: "We read that sentence as starkly as it is written, i.e., that *any* claim resulting from childhood sexual abuse as statutorily defined—without exception and without regard to whether the tortfeasor was a private or state actor—must be brought as provided in R.C. 2305.111(C)." 2015-Ohio-1776, ¶ 15, 39 N.E.3d 1207. . . .  Based on the breadth of the Ohio Supreme Court's ruling, the *Spragling* Court correctly noted that "there is little doubt that virtually all state law claims would fall under the expanded statute of limitations offered by O.R.C. 2305.111(C)." . . . Defendants argue that the 2006 amendment lengthening the statute of limitations in Section 2305.111(C) to twelve years left the applicable limitations period for Title IX claims untouched in the wake of the Sixth Circuit's ruling in *Lillard*. . . . This argument misunderstands how federal law presently determines limitations periods under Title IX. A state legislature does not determine when a plaintiff must file suit under Title IX. Federal law does. Because Congress has remained silent on the issue, federal courts look to the limitations period for the most analogous State law cause of action—the twelve-year period of Section 2305.111(C) in this case.

*Doe 1*, 533 F.Supp.3d at 573–74.

This Court should follow Judge Calabrese's ruling and apply the more analogous statute – the statute designed to protect child victims like Estee Pryor. A contrary result would not only deprive Plaintiff of her day in court but would also potentially deprive countless victims of child sex abuse of a type of relief that both Congress and the Ohio General Assembly clearly and unequivocally intended those victims to have. Ultimately, the only reason to apply the shorter statute of limitations is to cut off one of few civil remedies available to survivors of the most heinous abuse imaginable in our society.

## CONCLUSION

OSU's motion for summary judgment should be seen for what it is: a transparent attempt to short-circuit discovery in this case, coupled with a longshot argument in hopes that the Court will apply the wrong statute of limitations. This Court should

20

reject it outright, or at the very least allow discovery to continue before rendering an opinion.

Respectfully submitted,

s/ *Jonathan C. Little*
Jonathan C. Little- pro hac vice
Gabrielle Olshemski – pro hac vice
SAEED & LITTLE, LLP
#189-133 W. Market St.
Indianapolis, IN  46204
(317)-721-9214
jon@sllawfirm.com

Michael Fradin
8 North Court Street
Suite 403
Athens, Ohio 45701
mike@fradinlaw.com
847-986-5889

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served electronically via email, this 1st day of July, 2022 upon the following:

Michael Hiram Carpenter
Timothy R Bricker
David John Barthel
CARPENTER LIPPS & LELAND, LLP
barthel@carpenterlipps.com
bricker@carpenterlipps.com
carpenter@carpenterlipps.com

*/s/ Jonathan Little*

21